STATE of Minnesota, Respondent,

v.

James MALLORY, Appellant (C0–82–679),

Keith Mayes, Appellant (C1–82–867).

Nos. C0–82–679, C1–82–867.

Supreme Court of Minnesota.

Aug. 12, 1983.

C. Paul Jones, Public Defender, Kathy King, Asst. Public Defender, Minneapolis, for both appellants.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Lee W. Barry III, Asst. County Atty., Minneapolis, for respondent.

KELLEY, Justice.

Defendants Mayes and Mallory were charged, along with one Gary Williams, with two counts of aggravated robbery and one count of burglary, Minn.Stat. §§ 609.-05, 609.11, 609.245, and 609.58, subd. 2(1)(b) (1982). Williams was found guilty by a jury of the three charges and was sentenced by the trial court to two consecutive prison terms of 54 months for the robbery conviction and a concurrent term of 54 months for the burglary conviction. His convictions and sentence are affirmed in *State v. Williams,* 337 N.W.2d 387 (Minn.1983, filed herewith). After separate trial judges denied their motions to suppress, Mayes and Mallory each separately waived his right to a jury trial and agreed to let a different trial judge determine his guilt on the basis of stipulated facts, thereby preserving his right to raise the issues on appeal without putting the state and himself through the expense and time of a trial.[1] Each defendant was found guilty as charged and each was sentenced to three concurrent 54-month prison terms. In separate appeals and nearly identical briefs, each raises the same issues as the other, namely, the legality of the stop of the automobile and the fairness of identification procedures used by the police. After consolidating the appeals on our own motion, we affirm in this single opinion.

At 10:56 a.m. on October 27, 1981, a resident of Minnetonka, a suburb of Minneapolis, called police to report that she had seen a suspicious car with a black man in it parked on Hilloway Road at 10:45 a.m. and that several minutes later she saw the car there empty. The place where the car was parked is a place where there are no homes but is the type of place a burglar might park his car if he planned to burglarize a home in the area and did not want to park his car next to the house. The area is a so-called upper-bracket neighborhood of single family houses on large wooded lots. The police were unaware of any black people living in the neighborhood.

Two officers, Michael Olson and Douglas MacArthur, drove in separate cars to the place and found that there was now a second car parked approximately 100 feet away from the car the caller had described. One of the cars was an Oldsmobile registered to a Minneapolis resident, Mayes, and the other was a Cadillac registered to Williams, a resident of Brooklyn Park. The officers knew that one of the arrestees in connection with a recent daytime burglary in Minnetonka was a black man from Brooklyn Park, but they did not recall the man's name and had no way of checking on it because most of the department's officers were at a funeral for a fellow officer. That arrestee, in fact, was Williams, the man to whom the Cadillac was registered. Because of their hunch that a burglary might be in progress, the officers decided to put the cars under surveillance. Knowing that there were only two ways out for the cars, the officers parked in opposite directions but out of the view of the cars and they waited.

At 11:50 a.m., approximately 50 minutes after they began their surveillance, Officer Olson saw the Cadillac, driven by a black man, drive past his position. Officer Olson followed and stopped the car. The driver, Williams, produced a photo-identification card and was otherwise cooperative. Officer Olson explained why he had stopped him and asked him why he was in the area.

---

1. We approved this procedure in *State v. Lothenbach,* 296 N.W.2d 854 (Minn.1980).

Williams claimed he was in the area in connection with a landscaping job. Feeling that he could not detain him, Officer Olson let Williams go.

Meanwhile, Officer MacArthur had driven to a new location, so that he could see the Oldsmobile. He saw it but did not see an older model Mercedes that had been parked near where the Cadillac had been parked. However, Sergeant James Carlson, who was just coming on to duty after the funeral, drove right up to the place where the two cars were parked and, seeing the Mercedes, decided to run a registration check on it. He learned that it was registered to the Fennings, who lived on Byrnes Road, which was in the Sherwood Forest area fairly near the place where the car was parked. He knew that that neighborhood had a very high rate of burglaries and knew that the residence in which the Fennings lived had been burglarized before.

While parked there by the Oldsmobile and the Mercedes, Sergeant Carlson saw a newer model Mercedes sports car, driven by a black man, Mayes, driving out of the area where the Fennings lived. He directed Officer MacArthur to stop the car.

Officer MacArthur stopped the car at 12:04 p.m. and walked up to it. As he did so he saw a second black man, Mallory, wearing tight gloves, lying down in the front seat. He ordered Mayes to turn off the car, ordered the men to put their hands on their heads, and he put out a call for assistance. From that point on Officer Olson and the others followed a formalized procedure which they use in stops of people suspected of involvement in major felonies.

After one of the men was out but before they were both out of the car, the officers received a report that three armed black men had burglarized the Fenning house and robbed the Fennings. At that point the officers concluded that they had probable cause to arrest. Numerous items of evidence were found on the men in searches incident to their arrest, and other evidence was found in the car, which belonged to the Fennings. It was simultaneous with this that another officer informed Officer Olson

that Williams, the man he had let go, had been involved in earlier daytime burglaries in the area.

The Fennings were brought separately to the scene of the arrest. During the robbery they had decided not to look at the faces of the robbers. Their thinking was that if they did not look at the men's faces, the men would be less likely to kill them. Notwithstanding this, Mr. Fenning identified Mallory from his build, his mouth and his moustache as the robber who had worn a ski mask and he identified Mayes by his shoes. Mrs. Fenning was unable to identify anyone.

Williams was arrested later in the day and his Cadillac was searched and found to contain other incriminating evidence.

■ Defendants' first contention is that the two trial judges erred in concluding that the police validly stopped the car in which the defendants were riding. The test for determining the legality of the stop of a motor vehicle is whether the police had a particularized and objective basis for suspecting the occupants of criminal activity. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *State v. McKinley,* 305 Minn. 297, 232 N.W.2d 906 (1975). Defendants argue that the stop of the car was motivated by racial prejudice. We do not believe that this is an appropriate case in which to attempt to address in detail the issue of when race is a valid factor in a police officer's decision to investigate, approach, stop, detain and/or arrest a person. A clear example of a case in which we upheld the use of race as a consideration in a decision to stop is *State v. Walker,* 304 Minn. 590, 232 N.W.2d 212 (1975), followed in *State v. Smith,* 331 N.W.2d 234 (Minn. 1983). And *see* 3 W. LaFave, *Search and Seizure* § 9.3 at 75, n. 107 (1978). Suffice it to say, our examination of the records satisfies us that there was a particularized and objective basis for suspecting the occupant(s) of the car of criminal activity, and

accordingly we conclude that the stop was valid.[2]

There is no merit to the defendants' contention that the trial judges erred in denying their motion to suppress the identification testimony on due process grounds. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Lloyd,* 310 N.W.2d 463 (Minn.1981).

Affirmed.

**2.** The parties do not raise and we do not address the issue of standing in the context of the stop of a stolen motor vehicle. *See* 3 W. La-Fave, *Search and Seizure* § 11.3(e) (1978).